In the Matter of the Petition of NEW YORK WATER SERVICE CORPORATION, Petitioner, for an Order Directed to THE WATER POWER AND CONTROL COMMISSION OF THE DEPARTMENT OF CONSERVATION OF THE STATE OF NEW YORK, Re Water Supply Application No. 1286, Respondent.

COUNTY OF NASSAU, Objector, and COUNTY OF SUFFOLK, Intervenor, Respondents.

Third Department, July 11, 1939.

*Costello, Cooney & Fearon* [*George R. Fearon* of counsel; *M. Harold Dwyer* with him on the brief], for the petitioner.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor-General,* and *Timothy F. Cohan, Assistant Attorney-General,* of counsel], for the respondent.

*James L. Dowsey, County Attorney* [*Marcus G. Christ* and *John Mowat Mitchell* of counsel], for the County of Nassau.

*Edgar F. Hazleton, County Attorney* [*Guy O. Walser, Special Assistant County Attorney,* of counsel], for the County of Suffolk, *amicus curiæ.*

HEFFERNAN, J.   This is a review pursuant to article 78 of the Civil Practice Act of a decision by the Water Power and Control Commission of the Department of Conservation of the State of New York upon Water Supply Application No. 1286, denying petitioner's application for temporary authorization to use underground water for domestic purposes in the Flatbush area of the borough of Brooklyn.

Petitioner is a private water company engaged in operating a number of water supply plants in the State, one of which, the Flatbush Plant, supplies water for domestic, industrial and fire purposes to a portion of the borough of Brooklyn.   The population of the area so supplied was on December 31, 1937, estimated at 335,000 to 375,000 and is gradually increasing.   Petitioner furnishes about all the water used for various purposes in this section.

In October, 1937, it was supplying water to 83,333 families.   In addition it supplied various corporation and business uses and furnished 2,149 fire hydrants.   None of these consumers has available any other source of supply.   To meet the demand for water

petitioner has to rely upon its own wells located in the franchise area. The city of New York is unable with its present facilities to supply any additional water either to petitioner or to this area. The maximum supply of water available from petitioner's wells is slightly less than 29,000,000 gallons daily. The average daily consumption of water in 1937 was 27,200,000 gallons daily. During this period the peak consumption went as high as 33,000,000 gallons daily necessitating the use of the reserve supply from a 3,000,000 gallon tank.

Without analyzing the evidence in detail there is abundant proof that petitioner's available supply is insufficient to assure an adequate quantity and quality of water. The evidence is undisputed that the capacity of petitioner's existing authorized wells has fallen off due to screen stoppage and increasing salinity until at present there is no factor of safety in its Flatbush area. The situation is acute and it is imperative that petitioner replace some of its lost well capacity. Petitioner's sources of supply are failing and the demands on its system are increasing.

Confronted with this situation, petitioner on December 17, 1937, pursuant to the provisions of section 521 of article XI of the Conservation Law, applied to the Water Power and Control Commission for approval of its proposed construction and temporary operation of four gravelled wells, each having a capacity of 2,000,000 gallons daily, in and for the Flatbush territory. These proposed wells are for the purpose of partially replacing well capacity lost by reason of the encroachment of salt in certain existing wells and the falling off in capacity of other wells.

The only objections to petitioner's application were filed by the county of Nassau. These objections, in substance, are that the proposed plans are not justified by public necessity and are not just and equitable to such county and other municipalities; that the present pumpage of ground water from the area affected is already in excess of the capacity of that area to furnish water of a satisfactory quality; that any increase in the present rate of ground water development in Kings and Queens counties will have some future adverse effect upon the Nassau ground water supply; and that operation of the proposed wells would lead to contamination of the ground water supply in northwestern Queens county.

Hearings on the application were had before the executive engineer representing the Commission. On May 4, 1938, the Commission rendered its decision denying the application on the ground: " *First:* That the plans proposed are not justified by public necessity. *Second:* That said plans are neither just nor equitable to the other municipalities or civil divisions of the State affected thereby and

to the inhabitants thereof, particular consideration being given to their present and future necessities for sources of water supply." (58 State Dept. Rep. 714–718.)

That determination is the subject of this review. It is important to note that the Commission made no findings of fact.

In 1935 petitioner filed with the Commission an application for approval of its proposed construction and permanent operation of four gravelled wells, each having a capacity of 2,000,000 gallons daily, for the same plant. These wells were not designed to increase the authorized capacity of the plant. On the contrary, they were for the purpose of replacing well capacity which had been lost by encroachment of salt in existing wells and by a falling off in the capacity in other wells. That application was denied by the Commission and this court confirmed that determination (256 App. Div. 883).

The present application involves the same area and the same proposed wells as the former application. This application differs from the former one in one vital essential. The previous application sought approval for the perpetual operation of the proposed wells, whereas the present application merely seeks permission to operate such wells temporarily under such conditions as may be prescribed by the Commission and only until another source of supply is made available to the consumers in the area affected regardless of what that source is.

At the hearings petitioner's chief witness was its consulting engineer, a recognized authority on the subject involved. He testified that in his opinion the granting of the application would not damage the water sources of Nassau or any other county. He explained that the proposed wells would merely substitute water with slightly less salinity for water which is now being used and that the average consumption would not be increased because the proposed wells are merely replacement wells. Some of the wells from which water is now being taken in an area which has a tendency to salinity would be closed. He also testified that the proposed wells would be sufficient to give petitioner an adequate safety factor and to meet any increase in consumption until a new source is made available and that such a supply should be available in 1945 at the latest. This witness also testified, and in this he is not contradicted, that millions of gallons of water are daily wasting into the Atlantic ocean and Long Island sound from Nassau county. The evidence also establishes that the minimum supply available in Nassau county from rainfall without drawing upon the ground water table at all is 165,000,000 gallons daily. As opposed to this the highest estimate of present use of water in Nassau county is 70,000,000 gallons daily.

The evidence also discloses that even if the needs of Nassau county should materially increase in the near future there would still be a surplus supply for ten years or more and water would still waste into the sea and the sound from the county.

The county of Nassau, through the testimony of a hydrologic engineer, attempted to show that approval of the application would result in a lowering of the Long Island ground water table, producing increased salinity, and deprive it of future sources of water. This engineer's testimony was based largely on a comparison between the ground water levels in a series of tests across Nassau county which he made in March, 1938, with certain tests shown in a report in July, 1903. The test line which he ran in 1938 was not at the same point as that of 1903 but in some instances was as much as 1,500 feet away from the 1903 wells. These test wells were the only investigation which this witness made regarding the position of the Nassau ground water table and his opinion was based on those tests. It is quite significant that this witness admitted that the position of the ground water table is directly affected by the amount of rainfall and that the rainfall previous to 1903 was greatly in excess of the normal rainfall for a hundred-year period, 1806 to date, and that the total rainfall for the five to ten-year period prior to 1903 was substantially heavier than normal, whereas prior to 1938 rainfall had been below normal. The witness admitted that because of the difference in rainfall the ground water table levels in 1938 would be lower than in 1903. From the testimony of its own engineer it is quite clear that the granting of petitioner's application would result in no injustice to Nassau county.

In connection with its decision the Commission wrote a memorandum. Neither the decision nor the memorandum discusses the evidence.

After a careful review of the record we are convinced that the determination of the Commission is not only contrary to the credible evidence but is unsupported by any evidence. Were we reviewing the verdict of a jury on the same proof we would unhesitatingly set it aside. We are not disposed to lightly set aside determinations of quasi-judicial bodies. We cannot substitute our judgment upon the facts for that of the Commission. We review only questions of law and do not examine the facts further than to determine whether there is any substantial evidence to sustain the determination. (*Matter of New Rochelle Water Co.* v. *Maltbie*, 248 App. Div. 66.) There must be substantial common-law evidence of probative character to sustain the finding of the Commission. (*People ex rel. New York & Queens Gas Co.* v. *McCall*, 219 N. Y. 84; affd., 245

U. S. 345; *Matter of Yates* v. *Mulrooney,* 245 App. Div. 146.) A decision without some evidence of probative value is arbitrary and baseless. (*Matter of Carroll* v. *Knickerbocker Ice Co.,* 218 N. Y. 435; *Interstate Commerce Commission* v. *L. & N. R. R. Co.,* 227 U. S. 88.)

It is quite apparent that the Commission's determination is not based on the evidence in the record. In concluding his report in this case the Commission's engineer made the following remarkable suggestion: " It is suggested that in view of the above, and your previously announced policy with regard to wells in New York City, that there has not been presented to you anything which would justify you in revising or modifying your earlier decision with regard to these particular wells."

Singularly enough the memorandum of the Commission contains this statement: " Increasing knowledge of ground water conditions on Long Island has shown those conditions to be worse than was known at the time of the earlier application and to be moving rapidly towards the destruction of the usefulness of the water-bearing beds under Western Long Island by reason of increasing salinity of the water."

The record contains no evidence to justify such a conclusion. It is obvious that the decision is based upon some policy of the Commission heretofore enunciated and upon evidence not in the record and which petitioner had no opportunity to refute. That is not due process of law. The Commission's decision must rest upon evidence produced at a hearing and not upon knowledge possessed only by its own engineer. The petitioner had the right to challenge the evidence upon which the Commission acted and the failure to accord it that right deprived it of the fair hearing to which it was entitled. (*Matter of Grand View Dairy, Inc.,* v. *Baldwin,* 239 App Div. 640; *Matter of Yates* v. *Mulrooney, supra; Matter of Greenebaum* v. *Bingham,* 201 N. Y. 343.)

On the proof in this record it is impossible to escape the conclusion that the Commission acted arbitrarily and capriciously. Its failure to make findings of fact is another reason for condemning its determination. (*Matter of Elite Dairy Products* v. *Ten Eyck,* 271 N. Y. 488.)

The decision of the Water Power and Control Commission is, therefore, annulled, with fifty dollars costs and disbursements to petitioner, and the matter is remitted to the Commission for further action in accordance with this opinion.

CRAPSER, J., concurs; BLISS, J., concurs in the result, and votes to annul the determination and remit the matter to the Commission upon the ground that no findings of fact have been made by the

Commission, and that the decision is based upon evidence not in the record; HILL, P. J., dissents, and votes to confirm, on the following grounds: The necessity for potable water for use in a densely populated area is vital. The sources and courses and the flowage and seepage of subterranean waters are not subjects of which the ordinary public or the judiciary have knowledge. The taking of water for one area of a municipality from under the land of another may destroy the habitability of the latter.

Decision of the Water Power and Control Commission annulled, with fifty dollars costs and disbursements to petitioner, and matter remitted to the Commission for further action in accordance with the opinion.